UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
MARIE J. GILLES,

                       Plaintiff,

        - against -

GUY J. REPICKY,

                       Defendant.
------------------------------------------------------x

05 Civ. 374 (CLB)

*Memorandum and Order*

Brieant, J.

       Before this Court in this § 1983 case is Defendant's motion for summary judgment (Doc. No. 4), heard and fully submitted to the Court on December 9, 2005.

       Plaintiff Marie Gilles claims that her Fourth Amendment right to be free from unreasonable searches and seizures was violated by the Defendant, a Detective employed by the Westchester County Department of Public Safety ("the Department").

       The following facts are true, or assumed solely for purposes of the motion. Defendant Repicky is a Detective with the Department of Public Safety ("Department"); he is also the Department's Primary Counter-Terrorism Investigator. As a part of his responsibilities, he is advised on a regular basis by the New York State Police Upstate New York Regional Intelligence Center of all terrorism alerts and activities relevant to Westchester County.

       Ms. Gilles runs a business in Poughkeepsie. Ms. Gilles receives barrels stocked with food items, clothing, and school supplies, etc., from local people with relatives in Jamaica and

Haiti. She then drives the barrels in a van to a shipping company in the Bronx for the eventual delivery to Jamaica or Haiti.

On August 11, 2004 at approximately 8:30 a.m., Ms. Gilles was operating a white Dodge van Southbound on the Taconic Parkway in Westchester County, just south of Route 117. The van belongs to Ms. Gilles' brother, and she had permission to drive it. Ms. Gilles was carrying nine barrels in this van. The front license plate of this van had been lost in August of 2003. Ms. Gilles reported this to the Marlboro Police Department. A few weeks later the plate was found, and Ms. Gilles informed the Marlboro Police. She was told there was no written report needed; the information stating that the lost plate was found would be entered into the New York State Police computer. It was not.

Defendant while in his personal vehicle, on his way to work, observed the white van driven by Plaintiff. Defendant noticed that the van appeared to be weighed down unduly, and he could see the top of a 55 gallon drum, partially covered by a blanket. There also appeared to be more drums in the van. Defendant also observed that the van abruptly changed lanes and slowed down to 50 m.p.h. when it passed by a marked patrol car of the Department of Environmental Protection.

As a result of the Republican National Convention, which was scheduled to open in New York City on August 30, 2004, the Department had been put on alert specifically for vehicles carrying improvised explosive devices which could possibly be used in the New York City

Metropolitan area against the Convention attendees by terrorists. The alerts specifically referenced vans and other vehicles large enough to carry large devices.[1]

Based upon this knowledge, and his observation of the van Ms. Gilles was driving, Defendant called his Dispatcher and requested that he run the license plate of the van. Defendant was advised by the Dispatcher that the plate was returning on the State Police Computer as "stolen." Defendant called for back up to stop the van, and was present when a New York State Police marked patrol car stopped the van at approximately 8:45 a.m. The Defendant along with two units of the State Police, ordered Ms. Gilles out of the van at gunpoint and placed her in handcuffs. She was then placed in the rear of the marked State Police car.

Plaintiff and Defendant disagree as to what occurred thereafter. Ms. Gilles contends that the following occurred. Defendant asked her for her driver's license and she stated that it was in the van. Defendant searched the van and found the license, and the shipping invoices for the 10 barrels. She explained to Defendant that she ran a business in Poughkeepsie that often ships barrels overseas containing foods, school supplies, etc. When the officers searched the van, Defendant Repicky found shipping invoices with the names of the people sending the barrels, listing such items as the contents.

Defendant contends that Ms. Giles was initially unresponsive to the questions he asked

---

[1] Home made bombs using farm fertilizers such as ammonium nitrate and diesel fuel are usually produced in 55 gallon drums. A similar device was used at the Alfred Murrah federal building in Oklahoma City.

her.  After about 5-10 minutes, she became responsive, and Ms. Gilles told Repicky that she was taking the barrels to Mount Vernon, but that she did not know what was in the drums because they were sealed when they were dropped off at her store.

Both parties agree that Ms. Gilles also told Officer Repicky about the lost license plate, and how it was later found, and reported as found to the Marlboro Police Department.  Defendant contacted the Marlboro Police Department, and confirmed Ms. Gilles statement about the license plate.  The parties also agree that after the van was stopped, a bomb sniffing dog and a narcotics dog attended at the scene, with negative results.

Defendant contends that once it was determined that the van was not stolen, he told another officer on the scene to release Ms. Gilles' handcuffs.  Ms. Gilles contends she was not released until approximately 10 a.m.  She claims she was then ordered to proceed in her van to police headquarters.  She was escorted there between two police vehicles, held there for an additional one and one-half hours, and was released at approximately 11:30 a.m.

Defendant points out that a knife was recovered in the van, along with blood on the driver's side seat of the van and in the rear of the police car; there was concern that Plaintiff had injured herself.  Plaintiff had been hemorrhaging and had bled through her pants onto the van's seat and the police car seat.  Because of this, Defendant suggested that Plaintiff go to headquarters, where she could clean up and the investigation could be completed by contacting the shipping company and confirming that she does business with them.  Defendant says he

4

offered Ms. Gilles the option of coming to headquarters because she was sitting in blood soaked pants, and that Ms. Gilles, who went there willingly, did not know how to get there and so she followed a police car. There was a police car behind her as well, merely because the other police vehicle behind her was headed in the same direction. At headquarters, the officers spoke with someone at the shipping company and confirmed that Ms. Gilles was a regular customer, spoke with supervisors, and then told Ms. Gilles that she was free to leave.

*Summary Judgment Standard*

Fed. R. Civ. P. 56(c) provides that summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." If "reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). In evaluating the record to determine whether there is a genuine issue as to any material fact, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson* at 255. If, as to the issue "on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d. Cir. 1994).

Probably there are too many disputed issues of material fact to grant summary judgment on the merits. However, it seems clear to this Court that Detective Repicky is entitled to

qualified immunity from Plaintiff's claim against him. The inquiry into whether a suit against a police officer should go forward against a claim of qualified immunity is a two-step process: (1) the court must determine whether the facts, taken in the light most favorable to the party asserting an injury, show a violation of a constitutional right; and (2) the court must determine whether the constitutional right was "clearly established" such that "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. at 201-06 *(quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Cowan v. Breen*, 352 F.3d 756, 761 (2d Cir. 2003). The matter of whether a right was clearly established at the pertinent time is a question of law. *See, e.g., Crawford-El v. Britton*, 523 U.S. 574, 589 (1998); *X-Men Security, Inc. v. Pataki*, 196 F.3d 56, 66 (2d Cir. 1999). In contrast, the matter of whether a defendant official's conduct was objectively reasonable, i.e., whether a reasonable official would reasonably believe his conduct did not violate a clearly established right, is a mixed question of law and fact. *See, e.g., Lennon v. Miller*, 66 F.3d 416, 422 (2d Cir. 1995). "A contention that--notwithstanding a clear delineation of the rights and duties of the respective parties at the time of the acts complained of--it was objectively reasonable for the official to believe that his acts did not violate those rights 'has its principal focus on the particular facts of the case.'" *Kerman v. City of New York*, 374 F.3d 93, 108 (2d. Cir. 2004) (*quoting Hurlman v. Rice*, 927 F.2d 74, 78-79 (2d Cir. 1991)). "Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual questions must be resolved by the fact finder." *Kerman* at 108. "Though 'immunity ordinarily should be decided by the court,'. . . that is true only in those cases where

6

the facts concerning the availability of the defense are undisputed; otherwise, jury consideration is normally required . . . ." *Oliveira v. Mayer*, 23 F.3d at 649 (2d. Cir. 1994) (*quoting Hunter v. Bryant*, 502 U.S. 224, 228 (1991)). After receiving "the jury['s] . . . decision as to 'what the facts were that the officer faced or perceived,'" the court then may "make the ultimate legal determination of whether qualified immunity attaches on those facts." *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003).

There is no dispute of the context of this case that a person may not be arrested without probable cause. A *Terry* stop may be conducted simply on reasonable suspicion. If the Court accepts, as it must, Plaintiff's contention that she did not go willingly with the police vehicles to headquarters, the *Terry* stop then ripened into an arrest.

The issue in this case is simply whether the Detective's conduct under the circumstances was objectively reasonable, that is to say, that a reasonable police officer so situated would believe the conduct did not violate a clearly established Constitutional right. This is a fact-intensive question and yet the caselaw is to the effect that immunity ordinarily should be decided by the Court and, because the immunity extends to freedom from lawsuit rather that merely freedom from a damages verdict, should be decided by the Court wherever possible in advance of trial.

This Court concludes that it was objectively reasonable for Detective Repicky to have believed that his actions were lawful at the time of the stop and detention of Plaintiff. He had

7

arguable probable cause because it was objectively reasonable for him to believe that probable cause existed, and at the very least officers of reasonable competence could disagree on whether probable cause existed. *See Escalera v. Lunn,* 361 F.3d 737, 743.

This must be resolved by considering all of the relevant facts known to Detective Repicky at the time he acted. These include the awareness of a high level of terrorism alert, and the report that the license plate was stolen, together with his observation of fifty-five gallon drums covered with a blanket in an overweight vehicle headed towards New York City. While most drivers slow down to the posted speed limit upon seeing a marked patrol car, including that of an Environmental Enforcement Officer who does not ordinarily give traffic tickets, this fact is also present and must not be overlooked.

It is well known that persons using stolen vehicles very often steal and switch license plates to avoid apprehension. This Defendant is not responsible for the failure of the Marlboro Police Department to correct the computer entry, and the issue of probable cause cannot be tested by hindsight.

At the very least, this Court concludes that Detective Repicky under the circumstances of this case is entitled to the absolute defense of qualified immunity available to Police Officers.

necessary to avoid an accident, while off duty officers' thoughts are generally elsewhere. In this case, an alert and thoughtful officer with special professional obligations in connection with terrorist activities in the area, made a series of observations and acted reasonably upon them. Such conduct should be encouraged by Society and the Courts; not deterred by forcing the Officer to go to trial simply because the person stopped or arrested turned out later to be innocent of any wrongdoing. To the extent Plaintiff complains that the Officers including the supporting New York State Troopers should have released her earlier, the fact that more time was taken than necessary in connection with otherwise reasonable police conduct is not in itself a basis for a civil rights violation.

For the foregoing reasons, the motion is granted and the action is dismissed. The Clerk shall file a final judgment.

SO ORDERED.

Dated: White Plains, New York
February 15, 2006

*Charles Brieant*
Charles L. Brieant, U.S.D.J.